**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER JOHN JURCAGO, | ) | CASE NO. 5:23-CV-01187-JG |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | JAMES GWIN |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff, Christopher John Jurcago ("Mr. Jurcago"), seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying his application for Disability Insurance Benefits ("DIB"). (ECF No. 1.) This matter is before me pursuant to 42 U.S.C. §§ 405(g) and Local Rule 72.2(b). (*See* ECF non-document entry dated June 13, 2023). For the reasons set forth below, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision.

## II.      PROCEDURAL HISTORY

On February 1, 2021, Mr. Jurcago filed an application for DIB, alleging a disability onset date of October 6, 2019. (Tr. 168-69.)[2] Mr. Jurcago's application related to his diabetes, foot neuropathy, right ankle issues, Charcot foot in his right foot,[3] and right shoulder rotator cuff tear.

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

[2] The administrative transcript ("Tr.") appears at ECF No. 4 on CM/ECF. All page number references to the administrative transcript herein are to the Bates numbers on the bottom right-hand corner. All other record citations are to the CM/ECF-generated page numbers ("PageID#").

[3] Charcot foot is a rare complication of diabetes-related neuropathy (nerve damage) that affects the bones, joints, and soft tissues in the feet and ankles. *See* Charcot Foot, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15836-charcot-foot (last visited Apr. 30, 2024).

(Tr. 207.) The ALJ's decision noted the following severe impairments: morbid obesity, diabetes mellitus with peripheral neuropathy, left hallux gangrene – status post left great toe amputation, bilateral varicose veins, left knee degenerative joint disease, cervical degenerative disc disease, right shoulder impingement, left hand degenerative joint disease, post-concussive syndrome/headaches, and reactive depression. (Tr. 18.)

Mr. Jurcago's application was denied initially and upon reconsideration. (Tr. 101-04, 106-09.) Mr. Jurcago requested a hearing before an administrative law judge ("ALJ"). (Tr. 112-13.) The ALJ held a telephone hearing on February 25, 2022, at which Mr. Jurcago was represented by counsel. (Tr. 31-76.) Mr. Jurcago testified, as did an independent vocational expert ("VE"). (*Id.*) On June 13, 2022, the ALJ issued a written decision, finding that Mr. Jurcago was not disabled. (Tr. 15-26.) The ALJ's decision became final on April 13, 2023, when the Appeals Council declined further review. (Tr. 1-3.) Mr. Jurcago filed a Complaint on June 13, 2023, challenging the Commissioner's final decision. He raises four assignments of error:

(1) The ALJ erred when he failed to properly evaluate Plaintiff's migraine headaches at Step Three of the Sequential Evaluation.

(2) The ALJ erred at Step Three of the Sequential Evaluation when he failed to comply with the relevant Social Security Rulings, 14-2p and 19-2p, and find that the combination of Plaintiff's obesity and diabetes equaled a listing.

(3) The ALJ's RFC finding that Plaintiff could perform work at the light level of exertion was not supported by substantial evidence.

(4) The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence, and limiting effects of Plaintiff's symptoms, including pain, precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF No. 6, PageID#1812.)

2

### III.  BACKGROUND[4]

#### A.  Personal, Educational, and Vocational Information

Mr. Jurcago was born in 1970, and he was 49 years old on the alleged disability onset date. (Tr. 24, 40.) He lives with his wife. (Tr. 41.) He has a standard driver's license and a commercial driver's license. (Tr. 42-43.) He is a high school graduate. (Tr. 42.) He completed training to be a pharmacy technician, but his pharmacy technician certificate has expired. (Tr. 43.) His past relevant work was employment as a tractor-trailer truck driver, school bus driver, building maintenance repairer, and hand sprayer.  (Tr. 24, 70-71.)

#### B.  Relevant Non-Medical/Medical Opinion Evidence

The only opinions in the medical record are those of the state agency consultants. On May 20, 2021, Steve McKee, M.D., reviewed Mr. Jurcago's record at the initial level of consideration. (Tr. 80-85.) Dr. McKee noted that Mr. Jurcago had a height of 70 inches and a weight of 280 pounds. (Tr. 81.) He explained that in January 2021, Mr. Jurcago had "[n]umbness from above [his] ankle to the foot due to his diabetes" and was subsequently diagnosed with diabetic neuropathy. (Tr. 82.) However, Dr. McKee noted that Mr. Jurcago was able to attend to activities of daily living and driving. (Tr. 83.) Dr. McKee then concluded that Mr. Jurcago could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of 6 hours in an 8-hour workday; and sit four about 6 hours in an 8-hour workday. (Tr. 84.) Dr. McKee also noted that Mr. Jurcago can occasionally climb ladders, ropes, or scaffolds; can frequently climb ramps or stairs; and is limited to frequently reaching overhead with his right upper extremity. (Tr. 84-85.) Lynne Torello, M.D., reviewed the record at the reconsideration level on September 13, 2021, and agreed with Dr. McKee's findings. (Tr. 90-94.)

---

[4] Because Mr. Jurcago only challenges the ALJ's findings regarding his physical impairment, this Court limits its discussion of the evidence to Mr. Jurcago's physical impairments.

C. **Relevant Medical Evidence**

On October 7, 2019, Mr. Jurcago went to the hospital after he was involved in a motor vehicle accident while driving a semi-truck. (Tr. 259.) He was unable to remember the accident because he "blacked out." (*Id.*) That same day, he obtained x-rays of his hand based on a history of a laceration to his left forearm, pain, and bleeding. (Tr. 305.) The x-ray revealed no acute left forearm or left hand osseous abnormality, mild degenerative changes, and proximal dorsal forearm soft tissue swelling. (*Id.*) He also obtained a CT scan of his cervical spine based on a history of head and neck pain following his motor vehicle accident. (Tr. 304.) He had no cervical fracture or subluxation, and there was straightening of the cervical curve and degenerative changes present at the c5/6 and C6/7 levels. (*Id.*)

Mr. Jurcago met with Timothy J. Nice, M.D., a physician specialized in orthopedics, on January 30, 2020. (Tr. 319.) Dr. Nice explained that Mr. Jurcago was involved in a vehicular accident in October 2019. (*Id.*) Dr. Nice indicated that Mr. Jurcago "had post-concussive syndrome as is still suffering from [the headaches]." (Tr. 320.) Dr. Nice also noted that Mr. Jurcago had paresthesias over the C5, C3, and C4 dermatome patterns of his chest wall and cervical spine. (Tr. 319.) He also had numbness in both feet but no atrophy of his muscles, good muscle tone, and good muscle control in his lower extremities. (*Id.*) Dr. Nice noted that the numbness in Mr. Jurcago's lower legs was "most likely diabetic neuropathy." (Tr. 320.)

On March 3, 2020, Mr. Jurcago reported to Dr. Nice that he was experiencing headaches three days a week and some intermittent paresthesias going down "mostly his left arm over the C6 distribution." (Tr. 366.) Dr. Nice indicated that a medical provider previously told Mr. Jurcago that that he did not have a head injury, but Dr. Nice disagreed with this conclusion and noted that Mr. Jurcago had a "mild concussion, minimal brain trauma [,] or however we need to term it."

(*Id.*) Dr. Nice observed that Mr. Jurcago's headaches and paresthesias in his left arm were decreasing. (*Id.*) Mr. Jurcago, however, still had loss of motion in his cervical and lumbar spine, but no symptoms in his lower extremity. (*Id.*)

On March 6, 2020, Mr. Jurcago's primary care physician, Marwan Antoine Hilal, M.D., assessed that Mr. Jurcago had uncontrolled diabetes, hypertension, obesity, diabetic polyneuropathy, obstructive sleep apnea, hyperlipidemia, and reactive depression. (Tr. 375.) On August 5, 2020, Dr. Hilal observed that Mr. Jurcago's body mass index ("BMI") was 40.08, consistent with morbid obesity. (Tr. 453.) Mr. Jurcago's gait was normal, and he walked without an assistive device. (Tr. 452.) His examination revealed no abnormalities in his extremities besides edema in his distal legs bilaterally. (Tr. 453.)

On November 6, 2020, Mr. Jurcago obtained x-rays of his right shoulder based on a history of frequent dislocations and possible impingement. (Tr. 499.) The x-ray showed no evidence of acute fracture or osseous malalignment, and the joint spaces were well preserved. (*Id.*) That same day, his physical examination showed decreased range of motion of his neck, edema in his bilateral lower extremities, diffuse midsize varicosities, hyperpigmentation in his ankles, and vibratory perception decreased bilaterally. (Tr. 448.)

On March 24, 2021, Mr. Jurcago presented to Anthony George, M.D., MPH, for a follow up visit regarding his right shoulder, neck, and bilateral knee pain. (Tr. 595.) Mr. Jurcago complained that his neck pain was constant, and that he experienced infrequent numbness and tingling. (*Id.*) He said his right knee was worse since his last visit, but he was not taking any medication. (*Id.*) Physical examination revealed Mr. Jurcago had right shoulder impingement at 90 to 120 degrees, and right external rotation was 80 degrees. (*Id.*) Based on these findings, Dr. George diagnosed Mr. Jurcago with a sprain of the ligaments of the cervical spine and strain of

unspecified muscle, fascia, and tendon at the shoulder and upper arm level. (Tr. 596.) Dr. George provided Mr. Jurcago with a trigger point injection of Kenalog and Lidocaine in his right shoulder, which he tolerated well. (*Id.*)

On April 27, 2021, Mr. Jurcago returned for a follow-up appointment with Dr. George. Mr. Jurcago reported that his knee pain was "almost non-existent," but his neck pain with numbness and tingling was "getting worse." (Tr. 1786.) He stated that his neck is "constantly popping." (*Id.*)

On June 29, 2021, Mr. Jurcago obtained x-rays of his left knee based on a history of knee pain/sprain, which revealed possible small suprapatellar effusion, no fracture or dislocation, degenerative changes with small areas of osteophyte formation, and the medial and lateral compartment joint spaces were grossly preserved. (Tr. 1725.)

On January 13, 2022, Mr. Jurcago was hospitalized at Cleveland Clinic for cellulitis. (Tr. 618.) He underwent a surgical procedure for an amputation of his left great toe at the metatarsophalangeal joint level, incision and drainage, debridement of the wound, and excisional bone biopsy. (Tr. 688.) He tolerated the procedures well without complications and received the postoperative diagnoses of gangrene of the left foot, with abscess, cellulitis, septic joint, puncture wound, and diabetic foot ulcer. (*Id.*)

### D.  Relevant Hearing Testimony and Statements

#### 1.  *Mr. Jurcago's Pain Questionnaire*

Mr. Jurcago completed a Pain Questionnaire on March 18, 2021. (Tr. 215-17.) He indicated that he experiences pain in his right foot, right ankle, right shoulder, neck, and back. (Tr. 215.) He described this pain as a moderate to severe ache and sometimes "stabbing." (*Id.*) He indicated he experiences right foot and ankle pain "constant[ly]," back and neck pain "most of the time," and right shoulder pain frequently. (*Id.*) Walking, standing, lifting, and turning his head causes or

increases his pain. (*Id.*) He indicated his neck and back restricts what he can lift and how he sits, and his shoulder restricts his lifting. (Tr. 216.) He also indicated that due to pain he is restricted regarding where he can go while walking and how long he can walk. (*Id.*) He takes Gabapentin and Baclofen, and massages with oils for pain relief one to two times a week. (*Id.*)

### 2.  *Mr. Jurcago's Hearing Testimony*

At the February 2022 hearing, Mr. Jurcago testified that he is unable to work due to headaches, a toe amputation, and pain in his shoulder, neck, and back. (Tr. 57-58.) He stated that he experiences headaches two to three times per week since a vehicular accident that occurred in 2018. (Tr. 53.) He alleged that his headaches last up to a couple of hours, and his treatment methods included taking Ibuprofen and lying down in a dark room. (Tr. 53-54.)

Mr. Jurcago also stated that he experienced a stabbing and stiff sensation in his neck that radiates to his shoulders and down his spine. (Tr. 54-55.) He said he occasionally has trouble reaching overhead, his right shoulder pops in and out, and he started using a cane after his toe amputation. (Tr. 55, 57-58.) He alleged that he has trouble holding things with both hands related to his neuropathy, experiences knee pain, and has varicose veins. (Tr. 57.) He stated that he had swelling in his legs and his only relief was sitting with his legs elevated. (Tr. 67.)

Regarding his activities of daily living, Mr. Jurcago testified that he has a driver's license and is able to drive. (Tr. 42.) On a typical day, Mr. Jurcago said he completes some household chores such as cleaning dishes. (Tr. 63.) He testified that he is able to take care of his personal hygiene, but his wife helps him put on his shoes, and he has a stool in the shower. (*Id.*) At the time of the hearing, he was working part-time at Home Depot. (Tr. 42.)

### 3. *Vocational Expert's Testimony*

The VE opined that Mr. Jurcago's past relevant work was employment as a school bus driver, tractor trailer truck driver, hand sprayer, and building maintenance repairer. (Tr. 70-71.) The ALJ first asked the VE whether an individual with Mr. Jurcago's age, educational background, and work experience could perform work at the light exertional level, except he would be further limited to occasional climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, crouching, or crawling; and to the performance of simple, routine tasks, and simple, work-related decisions. (Tr. 71.) The VE opined that this individual could not perform Mr. Jurcago's past relevant work but could perform work as a cashier and sales attendant. (Tr. 71-72.)

The ALJ then asked the VE whether the same individual from the first hypothetical could perform work if also limited to elevating his legs to waist level for two hours out of every work day. (Tr. 72.) The VE opined that no jobs would be available in the national economy for this individual. (*Id.*)

The ALJ next asked the VE whether an individual with the same limitations from the first hypothetical but instead limited to sedentary work could perform work. (*Id.*) The VE opined that the individual could not perform Mr. Jurcago's past relevant work. (*Id.*)

The ALJ also asked the VE whether an individual with same limitations from the first hypothetical could perform work if he were off task 20 percent of the time and absent three times per month. (Tr. 73.) The VE opined that there would be no work available. (*Id.*) The VE's opined that an individual can be off task no greater than 14 percent of the work day and absent no more than eight days per year in order to maintain employment in the national economy. (*Id.*)

Mr. Jurcago's counsel asked if the individual from the first hypothetical could perform work if also limited to occasional handling and fingering. (Tr. 74.) The VE opined that there would be no work available. (*Id.*)

## IV.    ALJ'S DECISION

The ALJ first determined that Mr. Jurcago meets the insured status requirements of the Social Security Act through December 31, 2024. (Tr. 17.) The ALJ then determined that Mr. Jurcago has not engaged in substantial gainful activity since October 6, 2019, the alleged disability onset date. (Tr. 18.) The ALJ next determined that Mr. Jurcago has the following severe impairments: morbid obesity; diabetes mellitus with peripheral neuropathy;[5] left hallux gangrene-status post left great toe amputation; bilateral varicose veins; left knee degenerative joint disease; cervical degenerative disc disease; right shoulder impingement; left hand degenerative joint disease; post-concussive syndrome/headaches; and reactive depression. (Tr. 18.) However, the ALJ determined that none of these impairments—individually or in combination—meet or medically equals the severity of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (Tr. 18-24.)

The ALJ also determined that Mr. Jurcago has the residual functional capacity to perform work at the light exertional level, except he can frequently reach in all directions bilaterally; can frequently handle and finger with his bilateral upper extremity; can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; is limited to simple, routine tasks; and can make simple work-related decisions. (Tr. 20-24.)

---

[5] Peripheral neuropathy occurs when the peripheral nerves (nerves located outside of the brain and spinal cord) are damaged. This condition often causes weakness, numbness, and pain, usually in the hands and feet. One of the most common causes of this condition is diabetes. *See Peripheral Neuropathy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Apr. 26, 2024).

The ALJ next determined that Mr. Jurcago is unable to perform any past relevant work. (Tr. 24.) The ALJ explained that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Mr. Jurcago is not disabled. (Tr. 24-25.) Accordingly, the ALJ concluded that Mr. Jurcago has not been under a disability as defined in the Social Security Act from October 6, 2019, through the date of the ALJ's decision. (Tr. 25.)

## V.    LAW AND ANALYSIS

### A.  Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B.  <u>Standard for Disability</u>**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient

evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C. Analysis

#### 1. *The ALJ did not appropriately consider the relevant Listings and properly consider that Mr. Jurcago's impairments meet or medically equal a Listing*

Mr. Jurcago raises four arguments. First, he argues that the ALJ failed to properly evaluate his migraine headaches at Step Three of the sequential evaluation process in accordance with Social Security Ruling ("SSR") 19-4p and Listing 11.02. Next, he argues that the ALJ failed to properly consider his diabetes with peripheral neuropathy when the ALJ did not mention SSR 14-2p or analyze his impairment throughout the sequential evaluation process. Mr. Jurcago then argues that the ALJ erred at Step Three because the ALJ failed to comply with the relevant Social Security Rulings (SSR 14-2p and 19-2p) and find that the combination of his obesity and diabetes medically equaled a listing. I find that the ALJ did not adequately consider Mr. Jurcago's diabetes with peripheral neuropathy at Step Three, but the ALJ did properly consider Mr. Jurcago's headaches and obesity at Step Three.

At Step Three of the disability evaluation process, the Commissioner must consider whether a claimant's impairments meet or medically equal any of the relevant listing requirements of 20 C.F.R. Part 404, Subpart P, App. 1, 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). An impairment that meets only some of the requirements of a listing does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Conversely, a claimant who meets the

requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). Significantly, the claimant bears the burden of demonstrating that she meets or equals a listed impairment at the third step of the sequential evaluation. *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014). "For a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531 (italics in original).

### a. The ALJ properly evaluated Mr. Jurcago's headaches at Step Three.

Mr. Jurcago argues the ALJ erred because the ALJ did not cite or apply SSR 19-4p, a ruling that offers guidance for assessing primary headache disorder. (ECF No. 6, PageID#1819-22.) As a result, Mr. Jurcago contends that the ALJ did not find him presumptively disabled at Step Three of the sequential evaluation process due to his headaches, which SSR 19-4p requires to be considered under Listing 11.02B—the listing for seizure disorder. (*Id.* at PageID#1821.)

The Commissioner acknowledges that the ALJ did not cite SSR 19-4p or Listing 11.02B but nevertheless contends that Mr. Jurcago does not satisfy Listing 11.02 because his headaches are secondary because they are a result of his motor vehicle accident. (ECF No. 8, PageID#1845-46.) The Commissioner also argues that the ALJ accommodated for any limitations caused by Mr. Jurcago's post-concussive syndrome/headaches by limiting him to light work and placing restrictions on his ability to perform postural activities. (*Id.* at PageID#846 (citing Tr. 20.)) The Commissioner's arguments are well-taken.

SSR 19-4p provides specific guidance on how "primary headache disorders" such as migraines are established and evaluated. *See* SSR 19-4p, 2019 WL 4169635 (Aug. 26, 2019).

13

Specifically, SSR 19-4p explains that there is no Step Three listing for primary headache disorder, but these impairments may be found to be medically equivalent to Listing 11.02B.  SSR 19-4p, 2019 WL 4169635, at *7. SSR 19-4p instructs that Listing 11.02 (paragraph B or D for dyscognitive seizures) is the "most closely analogous listed impairment" for an MDI of a primary headache disorder. *Id*. In relevant part, Listing 11.02B involves "[d]yscognitive seizures" occurring at least once a week for at least 3 consecutive months, despite adherence to a prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 11.02B. In determining whether a claimant's impairments are equivalent to Listing 11.02B, the ALJ is to consider:

> [a] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635, at *7.

Mr. Jurcago does not establish that the ALJ was required to consider his headaches under SSR 19-4p. SSR 19-4p defines primary headaches as those that "occur independently and are not caused by another medical condition." SSR 19-4p, 2019 WL 4169635, at *3. Here, the ALJ's decision attributed Mr. Jurcago's headaches to his vehicle accident. Specifically, the ALJ characterized Mr. Jurcago's headaches as "post-concussive syndrome/headaches." (Tr. 18.) The record reflects that in October 2019, Mr. Jurcago was involved in a vehicular accident. (Tr. 319.) He was admitted to the hospital and continued having headaches. (*Id.*) In January 2020, Dr. Nice noted that Mr. Jurcago had "headaches after the incident which would indicate he had post-

14

concussive syndrome and is still suffering from that." (Tr. 320.) Thus, as even Mr. Jurcago concedes, his headaches were caused by his vehicle accident, which means that he did not have a primary headache disorder as defined in SSR 19-4p. (Tr. 319-20.) Accordingly, the ALJ was not required to analyze Mr. Jurcago's headaches in accordance with SSR 19-4p. *See Dellarco v. Comm'r of Soc. Sec. Admin.*, No. 4:22-CV-00962-PAB, 2023 WL 3324833, at *10 (N.D. Ohio Apr. 20, 2023) (finding that SSR 19-4p not applicable because claimant's headaches were not a primary headache disorder as his symptoms were "readily attributable" to his cervical spine disorder); *Tollon v. Comm'r of Soc. Sec.*, No. 1:21-CV-1507, 2022 WL 2610518, at *13 (N.D. Ohio May 3, 2022) ("Thus, the undersigned finds that Tollon has not identified evidence showing that her headache is a 'primary headache disorder' such that the ALJ was required to consider Listing 11.02.").

Finally, to the extent that Mr. Jurcago alleges that the ALJ failed to accommodate any limitations that were caused by his post-concussive syndrome/headaches, this claim fails. The ALJ accommodated any limitations that were caused by this condition by limiting Mr. Jurcago to light work and placing restrictions on his ability to perform postural activities. (Tr. 20.) He "does not point to any medical opinion or objective medical evidence to support h[is] argument that h[is] headaches required additional limitations, simply relying on h[is] subjective allegations." *Arthur v. Comm'r of Soc. Sec.*, No. 1:21-CV-00659-JRA, 2022 WL 566546, at *6 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 562453 (N.D. Ohio Feb. 24, 2022). Thus, I recommend that the Court reject this assignment of error because it lacks merit.

### b. The ALJ did not properly evaluate Mr. Jurcago's diabetes with peripheral neuropathy at Step Three.

Mr. Jurcago argues that the ALJ's decision should be reversed because the ALJ found his diabetes with peripheral neuropathy severe but did not mention Ruling 14-2p or analyze his

impairment throughout the sequential evaluation process other than to imply that the condition was related to obesity. (ECF No. 6, PageID#1822-26.) The Commissioner responds that the ALJ acknowledged that Mr. Jurcago had a history of diabetes mellitus with peripheral neuropathy, found the impairment to be severe, and limited him to a reduced range of light work consistent with the state agency consultants who considered the impairment and came to the same conclusion. (ECF No. 8, PageID#1847.)

To the extent that Mr. Jurcago argues that the ALJ erred by not explicitly citing SSR 14-2p, this claim lacks merit. SSR 14-2p simply "provides guidance" to ALJs in evaluating diabetes mellitus and notes that consideration of the "combined effects of DM and another impairment(s) can be greater than the effects of each of the impairments considered separately." SSR 14-2p, 2014 WL 2472008, at *1, 6. The Ruling further states that ALJs must "consider all work-related physical and mental limitations, whether due to an adult's DM, other impairment(s), or combinations of impairments." *Id.* at *6. SSR 14-2p imposes no requirement that this particular SSR be cited in conducting an analysis that follows its guidance. *See Quinn v. Comm'r of Soc. Sec.*, No. 1:23-CV-00029-CEH, 2024 WL 183960, at *5 (N.D. Ohio Jan. 17, 2024); *Schunn v. Comm'r of Soc. Sec.*, No. 1:20-CV-01779-PAG, 2021 WL 5868454, at *10 (N.D. Ohio Nov. 10, 2021), *report and recommendation adopted*, 2021 WL 5866990 (N.D. Ohio Dec. 9, 2021); *Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, at *2 (N.D. Ohio Dec. 16, 2019). Thus, the relevant issue is whether the ALJ complied with SSR 14-2p by conducting an analysis following its guidance.

The ALJ, however, did not adequately analyze Mr. Jurcago's diabetes mellitus with peripheral neuropathy. At the outset, the ALJ acknowledged that Mr. Jurcago's diabetes mellitus with peripheral neuropathy was a severe impairment at Step Two. (Tr. 18.) At Step Three, the ALJ further acknowledged that Mr. Jurcago has a history of diabetes mellitus with peripheral

neuropathy. (Tr. 21.) The ALJ, however, determined that despite Mr. Jurcago's subjective allegations, the medical evidence was consistent with the ALJ's RFC determination. (*Id.*) But beyond the ALJ's cursory mention of Mr. Jurcago's "history," the ALJ dedicates little to no discussion regarding Mr. Jurcago's diabetes mellitus with peripheral neuropathy. At most, a review of this decision reveals that the ALJ makes a brief mention of Mr. Jurcago's postoperative diagnosis of diabetic foot ulcer after his January 2022 left great toe amputation. (Tr. 22.) This limited discussion of the medical record does not elucidate how the ALJ reached his conclusion that Mr. Jurcago's diabetes mellitus with peripheral neuropathy only imposed the limitations stated in the ALJ's RFC determination.

The record reflects that Mr. Jurcago has diabetes and has experienced neuropathy as a result of his condition. (Tr. 443.) At a January 2020 appointment, Dr. Nice observed that the numbness in Mr. Jurcago's lower legs was most likely due to diabetic neuropathy. (Tr. 320.) Treatment notes indicates that he had uncontrolled diabetes and neuropathy. (Tr. 375, 443.) Mr. Jurcago reported to Dr. George on November 3, 2021, that his hands hurt when he worked and were tingling. (Tr. 1793.) At a November 17, 2021, appointment, Mr. Jurcago was noted to have severe diabetic neuropathy. (Tr. 1551.) He had large varicosities associated with hyperpigmentation and vibratory perception decreased bilaterally. (Tr. 1553.) And Mr. Jurcago was hospitalized for cellulitis and amputation of his great left toe in January 2022. (Tr. 618, 626.) The hospital notes indicate that treatment providers assessed Mr. Jurcago with diabetic foot infection, gangrene of the left great toe status post amputation, diabetic polyneuropathy, and type 2 diabetes. (Tr. 1795.)

Without further discussion of the evidence related to Mr. Jurcago's diabetes and its associated peripheral neuropathy, the ALJ's consideration of Mr. Jurcago's diabetes and its impairment on other impairments is not evident. *Cf. Dallas v. Comm'r of Soc. Sec.*, No. 1:20-cv-

11720, 2021 WL 5428827, at *11 (N.D. Ohio Oct. 26, 2021) (finding that ALJ's consideration of diabetes-related limitations was "evident from looking at the decision as a whole" where the ALJ discussed treatment records indicating claimant's diabetes was well-managed and there was no evidence of peripheral neuropathy), *report and recommendation adopted*, 2021 WL 5416718 (N.D. Ohio Nov. 19, 2021); *Lopes v. Comm'r of Soc. Sec.*, No. 5:23-CV-006744-DCN, 2024 WL 1120859, at *10-11 (N.D. Ohio Feb. 13, 2024) (finding that ALJ complied with SSR 14-2p where the ALJ considered claimant's diabetes and neuropathy throughout the sequential evaluation process), *report and recommendation adopted sub nom. Lopes v. Comm'r of Soc. Sec. Admin.*, 2024 WL 1120657 (N.D. Ohio Mar. 13, 2024). As a result, the ALJ's discussion failed to build a logical bridge between the evidence and the conclusion, and thus prevents this Court from meaningful review of the ALJ's consideration of the record as it pertains to this impairment. *Fleischer*, 774 F. Supp. 2d at 877.

### c. The ALJ properly evaluated Mr. Jurcago's obesity at Step Three.

Mr. Jurcago contends the ALJ committed harmful error by not considering the totality of his impairments in combination with his obesity. (ECF No. 6, PageID#1826-27.) SSR 19-2p states that obesity is not a listed impairment. SSR 19-2p, 2019 WL 2374244, at *4. However, the functional limitations caused by obesity, "alone or in combination with another impairment(s), may medically equal a listing" by sufficiently increasing the severity of a coexisting impairment. *Id.* Here, the ALJ complied with SSR 19-2p. As SSR 19-2p requires, the ALJ must consider the limiting effects of obesity when formulating the RFC because "[t]he combined effects of obesity with another impairment(s) *may* be greater than the effects of each of the impairments considered separately." SSR 19-2p, 2019 WL 2374244, at *4 (emphasis added).

Mr. Jurcago maintains that his obesity imposed severe complications on his other impairments. (*See* ECF No. 6, PageID#1826-27.) Mr. Jurcago bears the burden at Step Three "of showing specifically how his obesity, in combination with other impairments, limited his ability to a degree inconsistent with the ALJ's RFC determination." *Foss v. Comm' of Soc. Sec.*, No. 1:16CV1907, 2017 WL 2912524, at *8 (N.D. Ohio June 20, 2017), *report and recommendation adopted*, 2017 WL 2908857 (N.D. Ohio July 7, 2017) (alterations in original) (citations omitted). "Where a plaintiff disagrees that the analysis of obesity is adequate, [he] must further meet the 'burden of showing specifically how [his] obesity, in combination with other impairments, limited [his] ability to a degree inconsistent with the ALJ's RFC." *Montagna v. Kijakazi*, No. 20-1227-TMP, 2022 WL 565601, at *4 (W.D. Tenn. Feb. 24, 2022) (quoting *Lumpkin v. Comm'r of Soc. Sec.*, No. 1:20-CV-01849-DAP, 2021 WL 5828692, at *7 (N.D. Ohio Oct. 6, 2021)).

But Mr. Jurcago, represented by counsel, does not explain *what* more the ALJ was required to do or *how* his cited objective evidence indicates any more limitations that his obesity imposed. *See McWilliams v. Comm'r of Soc. Sec.*, No. 5:19-cv-2363, 2020 WL 7684864, at *12 (N.D. Ohio Aug. 26, 2020) ("Plaintiff's speculation that the ALJ was obligated to conclude that the combined impact of his obesity caused additional but unspecified limitations beyond those already accounted for in the RFC does not provide a basis for reversal."), *report and recommendation adopted*, 2020 WL 7043176 (N.D. Ohio Dec. 1, 2020). Nor does Mr. Jurcago point to any medical opinions that establish that his obesity imposed greater limitations than those encompassed in his RFC determination. *See Gray v. Comm'r of Soc. Sec.*, No. 20-10099, 2021 WL 298826, at *6 (E.D. Mich. Jan. 11, 2021) (finding limited findings regarding obesity sufficient where "there is no medical evidence in the record indicating that [plaintiff's] obesity increase the severity of her functional limitations or other impairments"), *report and recommendation adopted*, 2021 WL

19

289422 (E.D. Mich. Jan. 28, 2021). Thus, Mr. Jurcago does not meet his burden in establishing error in the ALJ's obesity analysis.

Finally, Mr. Jurcago argues, in a footnote of his merits brief, that the Medical Vocational Guidelines ("the Grid") Rule 201.14 direct a finding of disability for an individual with his vocational characteristics, approaching advanced age that was limited to sedentary work. (ECF No. 6, PageID#1825 n.1.) As a threshold matter, this one-sentence footnote is arguably a perfunctory and underdeveloped argument that should be waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). However, given that I conclude that the ALJ did not adequately consider Mr. Jurcago's diabetes with peripheral neuropathy under SSR 14-2p, the ALJ upon remand may determine whether potential limitations stemming from his conditions may warrant the application of Grid Rule 201.14.

> **2.  *The ALJ committed no reversible error in failing to include a cane limitation in the RFC determination or relying on the state agency findings.***

Mr. Jurcago alleges that the RFC determination limiting him to work at the light exertional level is not supported by substantial evidence. (ECF No. 6, PageID#1827-31.) First, he argues that the ALJ failed to include a cane limitation in his RFC determination. Second, he argues that the ALJ improperly relied on the state agency opinions because they were rendered "several years" prior to the ALJ's decision. Both arguments lack merit.

> **a.  The ALJ was not required to include a cane limitation in his RFC determination.**

Mr. Jurcago contends that substantial evidence does not support the ALJ's decision because he used a cane after his toe amputation, and the ALJ did not include a limitation for cane use in the RFC. (ECF No. 6, PageID#1830.) Mr. Jurcago points to his hearing testimony where he alleged

that he started using a cane after his amputation, as well as a treatment note from Dr. George indicating that he has "balance problems [due] to [his toe] amputation." (Tr. 1794.)

This argument lacks merit because Mr. Jurcago fails to establish that his cane was medically required. SSR 96-9p provides guidance for analyze whether one's use of a cane (or other hand-held assistive device) is medically required. For a cane to be medically required, "there must be a medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7.

Mr. Jurcago fails to meet his burden in demonstrating that his cane is medically necessary. While Mr. Jurcago testified that he uses a cane after his toe amputation, a claimant's testimony "does not qualify as 'medical documentation establishing the need for a cane under SSR 96-9p.'" *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *18 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom. Golden v. Comm'r of Soc. Sec.*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019); *Barnes v. Comm'r of Soc. Sec.*, No. 5:21-CV-01688-JDA , 2023 WL 2988346, at *8 (N.D. Ohio Mar. 22, 2023) (finding that testimony of claimant and claimant's mother that the claimant used a cane or walker at "virtually all times" did not qualify as medical documentation establishing the need for a cane under SSR 96-9p); *White v. Saul*, No. 1:20-cv-236, 2021 WL 1145463, at *8 (N.D. Ohio Mar. 25, 2021) ("Numerous court decisions have considered a plaintiff's testimony regarding the use of assistive devices, but found it unavailing when the record lacked supporting medical documentation demonstrating the requirement for such a device."); *see also Graham v. Comm'r of Soc. Sec.*, No. 1:23-cv-00574-JDA, 2024 WL 580969,

21

at *13 (N.D. Ohio Feb. 13, 2024) (finding that claimant failed to point to any medical evidence supporting a need for a cane beyond his own testimony).

Nor does Mr. Jurcago's reference to a single treatment note from Dr. George indicating that Mr. Jurcago had "balance problems" due to his toe amputation demonstrate that his cane is medically necessary under SSR 96-9p. (Tr. 1794.) Notably, this note makes *no* mention of cane usage or state that Mr. Jurcago was required to use a cane due to balance problems. (*See generally id.*); *see* SSR 96-9p, 1996 WL 374185, at *7. In fact, Mr. Jurcago fails to point to *any* medical documentation establishing the medical necessity of his cane and describing the circumstances for which the cane is needed. Thus, Mr. Jurcago's claim that the RFC determination should have included a cane limitation lacks merit. *See Berry v. Saul*, No. 1:18-cv-01906, 2019 WL 4600433, at *10 (N.D. Ohio Sept. 23, 2019) ("Plaintiff fails to draw this court's attention to any *medical records documenting and describing the circumstances for which a cane is needed* as required by SSR 96-9p." (emphasis in original) (citing *Perry v. Berryhill*, No. 1:16CV1880, 2018 WL 1393275, at *4 (N.D. Ohio Mar. 20, 2018)).

**b. The ALJ did not err in relying on the state agency findings.**

Mr. Jurcago argues that the ALJ improperly based his RFC determination on the opinions of state agency consultants that reviewed his file "several years" prior to the ALJ's decision and failed to consider evidence related to his toe amputation. (ECF No. 6, PageID#1829.) This argument fails.

First, Mr. Jurcago's assertion regarding when the state agency consultants reviewed his file is inaccurate. (*Id.*) Specifically, Dr. McKee reviewed his record at the initial level of consideration in May 2021, approximately one year before the ALJ's decision. (Tr. 80-85.) Dr. Torello reviewed his record in September 2021, nine months before the ALJ's decision. (Tr. 26, 94.) Thus, the state

agency consultants' findings were not provided "several years" prior to the ALJ's decision. (ECF No. 6, PageID#1829.)

Moreover, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision." *Jones v. Colvin*, No. 5:13CV1781, 2014 WL 459812, at *3 (N.D. Ohio Sept. 12, 2014) (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)). It is proper for the ALJ to rely on the state agency opinions, so long as the ALJ considers subsequent evidence and any relevant changes in the claimant's condition. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); *Brown v. Saul*, No. 1:18-CV-1463, 2019 WL 4039055, at *6 (N.D. Ohio Aug. 27, 2019) ("If an ALJ's decision includes a discussion of medical opinions or other evidence post-dating the State agency opinions, courts will generally find no error as the ALJ adequately reviewed the complete case record.") (collecting cases). As the Commissioner correctly points out, "[t]hat is precisely what happened here." (ECF No. 8, PageID#1854.)

The ALJ considered the evidence submitted after the state agency consultants reviewed the record. Contrary to Mr. Jurcago's assertion, the ALJ explicitly considered evidence related to Mr. Jurcago's toe amputation. For example, the ALJ noted that in January 2022, Mr. Jurcago underwent a procedure at the Cleveland Clinic for an amputation of the left great toe at the metatarsophalangeal joint level, incision and drainage, debridement of the wound, and excisional bone biopsy. (Tr. 22; *see* Tr. 688.) The ALJ explained that Mr. Jurcago tolerated the procedures well without complications and received postoperative diagnoses of gangrene, with abscess, cellulitis, septic joint, puncture wood, and diabetic foot ulcer. (*Id.*) However, the ALJ noted that in February 2022, Mr. Jurcago testified that he engaged in various activities such as driving, handling most personal care, and completed certain household chores such as cleaning the dishes.

(Tr. 21-22; *see* Tr. 42, 64.) Thus, Mr. Jurcago fails to establish any error in relying on the state agency opinions where the ALJ explicitly considered evidence post-dating the state agency findings. *Spies v. Saul*, No. 19-CV-2928, 2020 WL 5044027, at *15 (N.D. Ohio Aug. 26, 2020) ("The Sixth Circuit made it clear that it is appropriate for an ALJ to give great weight to a state agency reviewer's opinion, even when contrary evidence is submitted after the opinion is issued, so long as the ALJ considers the later evidence.").

Mr. Jurcago points to several pieces of testimony that he appears to argue that the ALJ failed to consider. (*See* ECF No. 6, PageID#1829-30.) If he is arguing that the ALJ was required to address every complaint Mr. Jurcago made throughout the relevant period, this argument should be rejected because "the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC." *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted sub nom. Byler v. Comm'r of Soc. Sec. Admin.*, 2022 WL 971834 (N.D. Ohio Mar. 31, 2022). Moreover, "[t]o the extent Plaintiff asserts that h[is] subjective complaints [] are documented within the medical records, that does not render them per se credible, nor are they transformed into 'medical opinions' simply because the patient's statements have been recorded in treatment notes." *Kurman v. Kijakazi*, No. 1:20-CV-1837, 2022 WL 1067568, at *9 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted sub nom. Kurman v. Comm'r of Soc. Sec.*, No. 1:20-CV-01837, 2022 WL 765072 (N.D. Ohio Mar. 14, 2022). Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### 3. *Compelling reason does not exist to disturb the ALJ's SSR 16-3p assessment.*

Mr. Jurcago argues that substantial evidence does not support the ALJ's SSR 16-3p assessment. (ECF No. 6, PageID#1831-33.) In support of this argument, he points to his hearing

testimony (Tr. 52-60, 62-68) and statements from his Pain Questionnaire (Tr. 215-17) to assert that "the medical evidence, as set forth in the preceding Arguments, supported [his] complaints regarding [his] limitations." (ECF No. 6, PageID#1832-33.) He asserts that the ALJ failed to account for his pain related to his continuing back, neck, shoulder, knee, and feet problems. (*Id.* at PageID#1833 (citing Tr. 445, 464, 1551, 1659.)) The Commissioner disagrees and contends that this Court should defer to the ALJ's assessment of Mr. Jurcago's allegations. (ECF No. 8, PageID#1855-58.) The Commissioner's argument is well-taken.

Evaluating an individual's subjective symptoms is a two-step process. SSR 16-3p, 2017 WL 5180304, at *3. First, the ALJ must consider whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* The ALJ must then evaluate the intensity and persistence of the individual's symptoms and determine the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second step, the ALJ may consider evidence directly from the claimant, or gleaned from other medical and non-medical sources (such as family and friends). *Id*.

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including the daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ must also determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.*

An ALJ is not required to accept a claimant's subjective complaints, *Jones v. Comm'r of Soc. Sec.*, 336 F. 3d 469, 476 (6th Cir. 2003), and need not "make explicit credibility findings as

to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). But the regulations require the ALJ to evaluate a claimant's symptoms, and the explanation must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d at 248; *see also* SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ does not need to use any "magic words," so long as it clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617-JDG, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). The ALJ's evaluation of subjective evidence receives great deference from a reviewing court. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). Absent compelling reason, a court may not disturb the ALJ's analysis of the claimant's subjective complaints, and the conclusions drawn from it. *Id.*

Here, a review of the ALJ's decision reveals that the ALJ based his findings on multiple relevant factors, and provided "specific reasons for the weight given to [Mr. Jurcago's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10. Mr. Jurcago acknowledges that the ALJ considered his subjective complaints and concluded that they were not entirely consistent with the medical evidence. (*See* ECF No. 6, PageID#1833.) He argues, however, that "the ALJ failed to articulate any supportably rationale for his finding." (*Id.*) This argument lacks merit. The ALJ considered Mr. Jurcago's allegations and testimony at the hearing. (Tr. 20, 23.) But as explained in further detail below, the ALJ specifically noted that Mr. Jurcago's treatment was mostly conservative, the diagnostic test results and physical examination findings were largely

unremarkable, and he engaged in daily activities that indicated a greater level of functioning than he reported. (Tr. 23-24.)

The ALJ discussed the objective medical evidence and relevant treatment history. *See* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2017 WL 5180304, at *5 ("[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms…"). Specifically, the ALJ noted that "[d]iagnostic test results and physical examination findings have been largely unremarkable, and the claimant had a mostly conservative treatment history for his physical health impairments since the alleged onset date." (Tr. 23-24.) For example, the ALJ noted that November 2020 x-rays of Mr. Jurcago's right shoulder revealed there was no evidence of acute fracture or osseous malalignment, and the joint spaces were well preserved. (Tr. 23; *see* Tr. 499.) The ALJ noted that Mr. Jurcago reported worsening knee pain in March 2021, but he was not taking medication. (Tr. 22; *see* Tr. 595.)

The ALJ also assessed Mr. Jurcago's allegations through his reported activities of daily living. *See* 20 C.F.R. § 404.1529(c)(3)(1); *see also Temples v. Comm'r of Soc. Sec.,* 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible)*.* The ALJ acknowledged that Mr. Jurcago reported difficulty in performing activities of daily living. (Tr. 20; *see* Tr. 63.) The ALJ, however, explained that Mr. Jurcago engaged in a "variety of daily activities that indicate a greater level of functioning than alleged." (Tr. 23.) For example, the ALJ noted that "in addition to [Mr. Jurcago's] extensive post onset work activity [at Home Depot], he reported engaging in activities such as driving, handling most personal care, and completing certain household chores." (Tr. 23; *see* Tr. 18, 21, 42, 63, 178-79.)

In addition, the ALJ considered the state agency opinions and concluded that their findings were generally consistent with the evidence. (Tr. 23-24; *see* Tr. 84-85, 93.) An ALJ's consideration of state agency findings is relevant to an ALJ's assessment of a claimant's subjective complaints. *See Benson v. Colvin*, No. 3:13 CV 67, 2013 WL 5797747, at *14 (N.D. Ohio Oct. 28, 2013) ("The Court finds the ALJ did not improperly assess [the claimant's] credibility…. As the ALJ correctly notes, state agency physician Bacalla and ME Gatens both concluded Benson was capable of a limited range of light exertional work."); *Quinn*, 2024 WL 183960, at *7; *Tomlin v. Comm'r of Soc. Sec.*, No. 4:23-CV-01192-CEH, at *11 (N.D. Ohio Apr. 12, 2024).

A review of the ALJ's decision demonstrates that the ALJ provided an adequate explanation for his determination that Mr. Jurcago's complaints were not entirely consistent with the evidence. (Tr. 23-24.) Mr. Jurcago does not explain how the ALJ's decision does not comply with SSR 16-3p or substantial evidence does not support the ALJ's SSR 16-3p analysis. Instead, he cites to evidence that he believes support his argument and contends that "[i]t is clear that the evidence in this matter established that [he] satisfied the criteria set forth in [SSR] 16-3p." (ECF No. 6, PageID#1833.) But Mr. Jurcago's disagreement with how the ALJ weighed the evidence does not establish a lack of substantial evidence supporting the ALJ's analysis. That is because "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003.) Thus, Mr. Jurcago presents no compelling reason to disturb the ALJ's SSR 16-3p analysis. *Baumhower*, 2019 WL 1282105, at *2.

Finally, Mr. Jurcago argues that the case should be reversed for a payment of benefits because the record is complete, and the evidence of disability is overwhelming. (ECF No. 6,

PageID#1835.) Here, Mr. Jurcago does not explain how—nor does independent review reveal—that the evidence of disability is overwhelming. (*See id.*) Moreover, there are factual issues that must still be resolved. For example, it is unclear what limitations Mr. Jurcago's diabetes with peripheral neuropathy imposes, and whether such limitations would merit the application of Grid Rule 201.14. An award of benefits "is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Early v. Comm'r of Soc. Sec.*, 893 F.3d 929, 934-35 (6th Cir. 2018) (quoting *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)); *see McClain v. Comm'r of Soc. Sec.*, 114 F. App'x 724, 727 (6th Cir. 2004) (remanding for further findings by the Commissioner "[i]n view of the fact-bound and record-bound nature of the parties' dispute…The deferential standard of review applicable to these cases generally counsels in favor of hearing from the ALJ first.").

Accordingly, I recommend that this case should be remanded for further proceedings, rather than an award of benefits. On remand, the ALJ would have an opportunity to properly evaluate the evidence regarding Mr. Jurcago's diabetes with peripheral neuropathy, which may change the RFC assessment.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE and REMAND the Commissioner's final decision for further proceedings consistent with this Report and Recommendation.

Dated: May 2, 2024                                    */s Jennifer Dowdell Armstrong*
                                                    Jennifer Dowdell Armstrong
                                                    U.S. Magistrate Judge


## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79

(6th Cir. 2019).